IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RTG-MI LLC f/k/a ROYAL GROUP SERVICES LTD LLC and GREGORY RICHMOND, | §<br>§<br>§<br>§ | |
| Plaintiffs, | §<br>§ | |
| V. | §<br>§ | No. 3:19-cv-251-BN |
| JETPAY PAYMENT SERVICES LLC, f/k/a JETPAY PAYMENT SERVICES TX LLC, and WLES LP | §<br>§<br>§<br>§<br>§ | |
| Defendants. | §<br>§ | |

## **MEMORANDUM OPINION**

Plaintiffs RTG-MI, LLC f/k/a Royal Group Services, Ltd, LLC and Gregory Richmond and Defendants JetPay Payment Services, TX, LLC, f/k/a JetPay Merchant Services, LLC ("JetPay") and WLES, LP (referred to collectively as "Defendants" or "JetPay") have filed cross-motions for summary judgment. *See* Dkt. No. 76 (Plaintiffs' Motion for Partial Summary Judgment); Dkt. No. 79 (Defendants' Motion for Summary Judgment).

For the reasons explained below, the Court grants Defendants' Motion for Summary Judgment and denies Plaintiffs' Motion for Partial Summary Judgment.

### **Background**

This is breach of contract case to enforce an indemnity agreement.

I.    <u>General Factual Background</u>

Trent Voight, who was the CEO of JetPay Merchant Services, LLC and

General Partner of WLES, LP, provides the following background, which Plaintiffs do not dispute:

> 3. JetPay Merchant Services, LLC was an "independent sales organization," or an ISO. It provided payment processing services to internet-based retail merchants for online financial transactions. For certain credit card companies (i.e., Visa, MasterCard, and Discover), JetPay bore the risk of refunding bank and credit card transactions if the retail merchant did not ship or deliver the item or service purchased.

> 4. Merrick Bank is an "acquiring bank" within the same payment networks as JetPay. Merrick enters into three-party agreements with ISOs and merchants, wherein Merrick receives payments for merchants from their customers, the ISO processes the payment through the payment network, and Merrick makes payment to the merchants. In turn, the merchant provides the product or service ordered by the customer.

> 5. When a cardholder (i.e., a customer) disputes a charge, usually due to a failure to receive the goods or services ordered, the cardholder notifies its issuing bank, which initiates a "chargeback." Upon notice of a chargeback, acquiring banks like Merrick must refund the cardholders' funds. Usually, this process is not difficult; the ISO assists the acquiring bank in obtaining the funds from the merchant and refunds the purchase to the cardholder. However, when a merchant goes out of business, ISOs and acquiring banks are often left "holding the bag," with an obligation to refund the cardholder, and no recourse from the merchant. These chargebacks are referred to in the industry as "uncollectible chargebacks."

> 6. Because of the significant risk posed by uncollectible chargebacks, ISOs and acquiring banks seek insurance coverage aptly known as "uncollectible chargeback insurance." These insurance policies protect ISOs or acquiring banks like Merrick from the significant losses that can come from uncollectible chargebacks.

> 7. Gregory Richmond is an insurance broker who, among other things, places insurance policies, including uncollectible chargeback insurance, with insurance carriers on behalf of his customers.

Dkt. No. 81 at 4-5 (Declaration of Trent Voight). Richmond was also the CEO of Royal

Group Services, Ltd., LLC ("RGS"). *See id.* at App. 47.

Chartis Specialty Insurance Company issued an uncollectible chargeback insurance policy to JetPay Merchant Services, LLC for the policy period July 20, 2011 to July 20, 2012 (the "JetPay Policy"). The policy had a $10 million aggregate liability limit. RGS and Richmond served as JetPay's insurance brokers in procuring the policy. *See* Dkt. No. 24. at 1.

One of the merchants covered by the JetPay Policy was Southern Sky Air Tours d/b/a Direct Air. Both JetPay and Merrick Bank provided credit and debit card process services to Direct Air. In March 2012, Direct Air ceased operations and filed for bankruptcy, resulting in the Direct Air Loss – an alleged $25 million chargeback loss against JetPay and Merrick Bank.

JetPay submitted an insurance claim under the JetPay Policy for coverage of uncollectible chargebacks resulting from the Direct Air bankruptcy. Chartis denied the claim.

II.   **JetPay sues Merrick Bank, RGS and Richmond for failure to obtain an insurance policy to protect it from the Direct Air Loss.**

On November 18, 2013, JetPay Merchant Services, LLC and WLES, L.P. filed suit against Merrick Bank, RGS, and Gregory Richmond (the "JetPay Action"). *See* Dkt. No. 78 at App. 2-App. 13; Dkt. No. 81 at App. 5-App. 16. (This lawsuit is referred to as the "Merrick Action" in the Settlement Agreement containing the Indemnity Provision and by the parties, but, for clarity here, the Court calls it the "JetPay Action.")

JetPay alleged that Merrick Bank, RGS, and Richmond failed to obtain a proper uncollectible chargeback insurance policy to protect JetPay from the Direct Air Loss. In its First Amended Complaint, JetPay asserted claims against all of the defendants for violations of the Texas Insurance Code, negligence, fraud, breach of the duty of good faith and fair dealing, and negligent misrepresentation. And JetPay asserted a breach of fiduciary duty claim and a breach of contract claim against Merrick Bank. *See id.*

III.   JetPay also seeks coverage under the JetPay Policy for uncollectible chargeback losses incurred due to the bankruptcy of a different merchant.

JetPay also allegedly incurred liability for uncollectible chargebacks due to the bankruptcy of Pacific Sports Health Management, Inc. ("PHSM") *See* Dkt. No. 24 at 1. JetPay submitted a claim for insurance coverage under the JetPay Policy for the PHSM Loss. *See id.* Chartis opened a claim regarding JetPay's claim for coverage (the "Claim"), which was disputed. *See id.*

JetPay subsequently filed an insurance coverage case against Chartis, RGS and Richmond regarding the disputed Claim (the "JetPay Policy Action"). *See id.* at 2; Dkt. No. 81 at 6 ¶ 10.

IV.   The Settlement Agreement and Indemnity Provision

On December 16, 2013, Chartis, RGS, Richmond, JetPay Merchant Services, LLC, and WLES executed a Settlement Agreement resolving two lawsuits filed by JetPay – the JetPay Coverage Action and the JetPay Action – as well as disputes concerning JetPay's PHSM Loss Claim and the JetPay Policy. *See* Dkt. No. 24.

The Settlement Agreement contains the following Indemnity Provision:

> JetPay agrees to forever indemnify and hold the Broker Releasees [RGS and Richmond] harmless from any and all claims, demands, actions, causes of action, suits, judgments, debts, obligations, rights, liabilities, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, foreseen or unforeseen, including, but not limited to any attorneys fees and costs, by or in favor of any other person or entity claiming any right against the Broker Releasees or any of them, arising from or out of, or relating in any way, in whole or in part, to (i) the JetPay Coverage Action, (ii) the Merrick [JetPay] Action, (iii) the Claim, and/or (iv) the JetPay Policy.

*Id.* at ¶ 4(B). The parties here agree that this lawsuit could only arise under the JetPay Action. *See* Dkt. No. 77 at 5; Dkt. No. 80 at 15 ¶ 20.

V.   **Merrick Bank sues RGS and Richmond for failure to obtain an insurance policy <u>to protect it from the Direct Air Loss.</u>**

On June 30, 2015, Merrick Bank sued its insurance brokers (RGS and Richmond), alleging that they failed to obtain proper uncollectible chargeback insurance coverage to protect Merrick Bank from the Direct Air Loss. It amended its pleadings when it learned that Richmond allegedly told Chartis to deny Merrick Bank's insurance claim. *See* Dkt. No. 78 at Ex. 2; Dkt. No. 81 at App. 20 – App. 40 (the "Merrick Action"). In its Second Amended Complaint, Merrick Bank asserted claims for negligence, breach of fiduciary duty, unjust enrichment, and tortious interference with contract.

The Court granted in part and denied in part Defendants' Motion for Summary Judgment. *See* Dkt. No. 78 at 42-43.

The Court denied summary judgment on the negligence claim and recharacterized the breach of fiduciary duty claim as a breach of contract claim. The

Court determined that those claims raised fact questions, including whether Merrick Bank asked RGS and Richmond to secure an insurance policy from Chartis that would have provided coverage for the Direct Air Loss. The Court dismissed the remaining claims, and ultimately the case was settled.

Maxum Indemnity Company provided coverage and defense for RGS and Richmond under the terms of an excess insurance policy. Maxum retained Clausen Miller to represent RGS and Richmond in the case. At their own expense, RGS and Richmond retained Foley & Lardner to oversee Clausen Miller's defense of the case.

VI.   RTG-MI and Richmond seek indemnity for attorneys' fees and expenses incurred in the Merrick Action.

On January 31, 2019, RTG-MI and Richmond filed this breach of contract lawsuit against JetPay Payment Services, TX, LLC f/k/a JetPay Merchant Services, LLC and WLES, LP.

In their Second Amended Complaint, Plaintiffs allege that JetPay and WLES are obligated to indemnify them under the terms of the 2013 Settlement Agreement for attorneys' fees and costs that they incurred in the Merrick Action.

Defendants contend that the Merrick Action is outside the scope of the Indemnity Provision.

Plaintiffs and Defendants have filed cross-motions for summary judgment on Plaintiffs' claims.

Each side asserts that the Indemnity Provision is unambiguous and should be construed in its favor.

Plaintiffs seek partial summary judgment regarding liability on their breach of contract claim, but not regarding the amount of damages, which they contend is a fact question to be determined later.

Defendants seek summary judgment on all of Plaintiffs' claims against them. Defendants assert that

- no valid contract exists between RTG-MI and Defendants;

- Gregory Richmond has not incurred any damages;

- the Indemnity Provision is unenforceable because it fails to meet Texas's "fair notice" requirements;

- the plain language of the Indemnity Provision does not encompass the claims made by Merrick Bank against RGS and Richmond in the Merrick Action; or,

- alternatively, the Indemnity Provision is ambiguous.

## Legal Standards

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual "issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003). "A factual dispute is 'genuine,' if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Crowe v. Henry*, 115 F.3d 294, 296 (5th Cir. 1997).

If the moving party seeks summary judgment as to his opponent's claims or defenses, "[t]he moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of the nonmoving party's case." *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which it will bear the burden of proof at trial. If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (cleaned up).

"Once the moving party meets this burden, the nonmoving party must set forth" – and submit evidence of – "specific facts showing a genuine issue for trial and not rest upon the allegations or denials contained in its pleadings." *Lynch Props.*, 140 F.3d at 625; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc);

*accord Pioneer Expl.*, 767 F.3d at 511 ("[T]he nonmovant cannot rely on the allegations in the pleadings alone" but rather "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." (cleaned up)).

The Court is required to consider all evidence and view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party and resolve all disputed factual controversies in favor of the nonmoving party – but only if the summary judgment evidence shows that an actual controversy exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Pioneer Expl.*, 767 F.3d at 511; *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005); *Lynch Props.*, 140 F.3d at 625. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor. While the court must disregard evidence favorable to the moving party that the jury is not required to believe, it gives credence to evidence supporting the moving party that is uncontradicted and unimpeached if that evidence comes from disinterested witnesses." *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 942-43 (5th Cir. 2015) (cleaned up). And "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston,* 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden, *Little*, 37 F.3d at 1075; *accord Pioneer Expl.*, 767 F.3d at 511 ("Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." (internal

quotation marks and footnote omitted)). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (cleaned up).

Rather, the non-moving party must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or (4) issue any other appropriate order." FED. R. CIV. P. 56(e).

And "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Pioneer Expl.*, 767 F.3d at 511 (cleaned up). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Scott*, 550 U.S. at 380 (cleaned up). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

-10-

"After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *DIRECTV, Inc. v. Minor*, 420 F.3d 546, 549 (5th Cir. 2005) (cleaned up). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (cleaned up).

The Court will not assume "in the absence of any proof ... that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075. "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment," and "[a] failure on the part of the nonmoving party to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists." *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (cleaned up).

If, on the other hand, "the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). The "beyond peradventure" standard imposes a "heavy" burden. *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, No. 3:04-cv-1866-D, 2007 WL 2403656, at

*10 (N.D. Tex. Aug. 23, 2007). The moving party must demonstrate that there are no genuine and material fact disputes and that the party is entitled to summary judgment as a matter of law. *See, e.g.*, *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003). On such a motion, the Court will, again, "draw all reasonable inferences in favor of the non-moving party." *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002).

"When parties file cross-motions for summary judgment, [the Court] review[s] each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Duval v. N. Assur. Co. of Am.*, 722 F.3d 300, 303 (5th Cir. 2013) (cleaned up).

## Analysis

Plaintiffs' only cause of action is for breach of contract.

To succeed on a breach of contract claim under Texas law, a plaintiff must show "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Sport Supply Grp., Inc. v. Columbia Cas. Co.* 335 F.3d 453, 465 (5th Cir. 2003); *accord Richardson v. Wells Fargo Bank, N.A.*, 873 F. Supp. 2d 800, 809 (N.D. Tex. 2012); Dkt. No. 24 at 13 ¶ 12 (providing that the Settlement Agreement shall be governed by and construed in accordance with Texas law).

I.   The Indemnity Provision is a valid, enforceable contract between the parties.

Defendants contend that the Settlement Agreement is not enforceable for two

reasons:

    (A)    RTG-MI does not have standing to enforce the Indemnity Provision because it was not a party in the JetPay Action or to the Settlement Agreement, and

    (B)    the Indemnity Provision does not comply with Texas's fair notice requirements.

    A.    <u>RTG-MI has standing to enforce the Indemnity Provision.</u>

Defendants contend RTG-MI cannot prevail on its breach of contract claim because RTG-MI was not a party to the Settlement Agreement where the agreement was executed by Royal Group Services, not RTG-MI. And, because RTG-MI was not a party to the Settlement Agreement, Defendants assert that RTG-MI cannot show that a valid contract exists between RTG-MI and Defendants.

Plaintiffs disagree. They submitted both deposition testimony and RTG-MI's corporate organizational records on file with the State of Michigan, which show the relationship of three entities – RGS Limited, LLC, Royal Group Services, Ltd., LLC, and RTC-MI, LLC – and provide a roadmap tracing the unbroken chain of ownership of the assumed name Royalty Group Services, Ltd., LLC.

RGS Limited, LLC was incorporated in 2007. *See* Dkt. No. 84 at App. 55-56. It was assigned identification number D132C. *See id*. RGS Limited, LLC began using the assumed name Royal Group Services, Ltd. LLC in 2009. *See id*. at App. 52 (Certificate of Assumed Name); *see also* App. at 37 (Renewal of Assumed Name in 2014).

On February 13, 2018, RGS Limited, LLC sold assets and the name RGS Limited, LLC to third-party Acrisure. *See* Dkt. No. 81 at 84-85; Dkt. No. 84 at 56. The Settlement Agreement was not included in the sale. *See* Dkt. No. 81 at 57*;* Dkt. No. 84 at 6.

Along with the sale, RGS Limited, LLC changed its name to RTG-MI, LLC. *See* Dkt. No. 84 at App. 29 (Certificate of Amendment to the Articles of Incorporation). RTG-MI, LLC was assigned the new identification number 801396884. *See id.* RTG-MI's sole purpose is to be a plaintiff in this lawsuit. *See* Dkt. No. 81 at 57. RTG-MI, LLC renewed the assumed name Royal Group Services, Ltd., LLC on October 15, 2024. *See id.* at App. 26.

The summary judgment evidence shows that Royal Group Services, Ltd., LLC – the party that executed the 2013 Settlement Agreement – came into existence as an assumed name of RGS Limited, LLC. The Settlement Agreement was excluded from the 2018 sale of RTG Limited, LLC's assets. But the name RTG Limited, LLC was part of the sale, so RGS Limited, LLC changed its name to RTG-MI and retained Royal Group Services, Ltd., LLC as an assumed name.

In the Settlement Agreement, JetPay agrees to release and indemnify the "Broker Releasees," who are defined, in part, as RGS and its affiliated entities and successors-in-interest. *See* Dkt. No. 24 at 4-5 ¶¶2(B), 4(B).

The Court determines that Plaintiffs have submitted sufficient summary judgment evidence to show that RTG-MI is RGS's successor-in-interest and an affiliated entity and that the 2013 Settlement Agreement is a valid contract between

RTG-MI and Defendants.

RTG-MI has standing to assert a claim to enforce the Indemnity Provision.

B.    The Texas fair notice requirements do not apply.

Defendants next contend that the Indemnity Provision is unenforceable under Texas law because it does not satisfy the fair notice requirements.

In Texas, a contract provision releasing a party from all liability claims caused by its own future negligence must comply with the fair notice requirements of the "express negligence doctrine" and "conspicuousness." *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993). The fair notice requirements apply only when "one party exculpates itself from its own future negligence." *Green Int'l Inc., v. Solis,* 951 S.W.2d 384, 387 (Tex. 1997); *see also DDD Energy, Inc. v. Veritas DGC Land, Inc.*, 60 S.W.3d 880, 885 (Tex. App. – Houston [14th Dist.] 2001, no pet.) (holding that fair notice does not apply "where an indemnitee is seeking indemnification from claims not based on the negligence of the indemnitee").

Here, Plaintiffs seek indemnity for attorneys' fees and expenses incurred in a lawsuit that they alleged arises from or is related to the claims settled in the JetPay Action, not for negligence after the Settlement Agreement was signed.

And "[t]he fair notice requirements are not applicable when the indemnitee establishes that the indemnitor possessed actual notice or knowledge of the indemnity agreement." *Dresser,* 853 S.W.3d at 508 n.2; *see Storage & Processors, Inc.* v. *Reyes*, 134 S.W.3d 190, 192 (Tex. 2004) ("[I]f both contracting parties have actual knowledge of the plan's terms, an agreement can be enforced even if the fair notice requirements

were not satisfied."); *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 20 S.W.3d 119, 126-27 (Tex. App. – Houston [14th Dist.] 2000, pet. denied) ("[T]he fair notice requirements are not applicable when the indemnitee establishes the indemnitor had actual notice or knowledge of the indemnity agreement.").

Although they dispute Plaintiffs' interpretation of the Indemnity Provision, Defendants do not dispute that they have actual knowledge of its terms. *See* Dkt. No. 81 at 6 ¶ 14 (Declaration of Trent Voight, JetPay's CEO). And the summary judgment evidence establishes that Defendants have actual knowledge of the Indemnity Provisions' terms because counsel for RGS, Richmond, and Defendants negotiated the terms of the Settlement Agreement. *See* Dkt. No. 38 at 7 ¶ 31 (Second Amended Complaint); *See* Dkt. No. 40 at 4 ¶ 33 (RGS's Answer) (admitting the Settlement Agreement was drafted and negotiated by counsel for all parties); Dkt. No. 41 at 4 ¶ 33 (WLES's Answer) (same); *accord* FED. R. CIV. P. 8(b)(6) ("An allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied.").

The Court concludes that the Texas fair notice requirements do not apply in this case.

II.   <u>The Merrick Action is not within the scope of the Indemnity Provision.</u>

"An indemnity agreement is a promise to safeguard or hold the indemnitee harmless against either existing and/or future loss liability." *Dresser,* 853 S.W.2d at 508. "A contract of indemnity should be construed to cover all losses, damages, or liabilities [that] reasonably appear to have been within the contemplation of the

parties, but it should not be read to impose liability for those losses or liabilities [that] are neither expressly within its terms nor [are] of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir. 1981).

Courts "construe indemnity agreements under normal rules of contract construction." *Gulf Ins. v. Burns Motors, Inc.* 22 S.W.3d 417, 423 (Tex. 2000). The primary goal is to ascertain and give effect to the parties' intent as expressed by the plain language they used in the contract. *See id.*; *see also Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017).

Whether a contract is ambiguous is a question of law for the court to decide. *See Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). When the contract is worded so that it can be given a certain or definite legal meaning, the contract is not ambiguous, and the court will construe the contract as a matter of law. *See id.* at 393.

The parties assert that the Settlement Agreement's Indemnity Provision is unambiguous but disagree as to whether the Merrick Action, including any claims and causes of action asserted and any attorneys' fees and expenses incurred by RGS and Richmond, arise from or out of, or relate in any way, in whole or in part, to the JetPay Action.

The Texas Supreme Court has defined the word "arise" and phrases like "arising from" and "arise out of" broadly to mean that there is simply a causal connection or relation. *See Yowell v. Granite Operating Co.*, 620 S.W.335, 353 (Tex. 2020); *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 308

(Tex. 2015); *see also RKI Exploration & Prod., LLC v. Ameriflow Energy Servs., LLC*, No. 02-20-00384-CV, 2022 WL 2252895, at *11-*12 (Tex. App. – Fort Worth June 23, 2022) (while construing language in indemnity agreement, containing an in-depth analysis of Texas precedent as to meaning of word "arise" and similar terms).

The phrase "relates to" also has a broad meaning. The United States "Supreme Court has described the 'normal sense' of the phrase 'relates to' as having a 'connection with' or 'reference to.'" *Beiser v. Weyler*, 284 F.3d 665, 669 (5th Cir. 2002) (construing meaning of phrase "relates to" and citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983)); *Cavin v. Abbott*, 545 S.W.3d 47, 69 (Tex. App. – Austin 2017, pet. denied) (defining term "relates to" to mean "there is some sort of connection, reference, or relationship between them").

Here, the parties to the Settlement Agreement chose broad language, providing indemnity for a list of matters "arising from or out of, or relating in any way, in whole or in part, to … the [JetPay] Action." Dkt. No. 24 at 9 ¶ 4(B). And so the Court will construe the Indemnity Provision broadly. *See, e.g.*, *JetPay Merchant Services, LLC v. Merrick Bank Corp.*, No. 3:13-cv-3101-L-BN, 2014 WL 798373, at *3 (N.D. Tex. Feb. 28, 2014) (construing forum selection clause broadly because it included both "arising from" and "relating to" language).

But there is a limit as to how broadly a contract may be construed. Courts "will avoid, when possible and proper, a construction that is unreasonable, inequitable and oppressive." *RKI Exploration*, 2022 WL 2252895, at *10 (cleaned up) (quoting *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (quoting *Reilly v.*

*Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987))). And courts will not "expand the parties' rights or responsibilities beyond the limits agreed upon by them in the contract." *Id.* at \*11. (quoting *Yowell*, 620 S.W.3d at 353 (quoting *Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951, 953 (Tex. 1983))).

The Court concludes the Indemnity Provision is unambiguous and does not encompass coverage of the Merrick Action because there is no causal connection between the two lawsuits. Although both lawsuits were founded on alleged failures to obtain uncollectible chargeback insurance that would have covered losses incurred because of the Direct Air bankruptcy, there is no but-for connection between RGS's and Richmond's failure to procure uncollectible chargeback insurance for JetPay and their failure to do so for Merrick Bank. *See RKI*, 2022 WL 225895, at \*11 ("arise out of' means that there is simply a 'causal connection or relation' … which is interpreted to mean there is but-for causation, though not necessarily direct or proximate causation" (cleaned up)) (discussing cases). In other words, the claims in the JetPay Action were based on injuries and rights belonging only to JetPay while those in the Merrick Action were based on injuries and rights belonging only to Merrick.

The Settlement Agreement resolved two lawsuits filed by JetPay: *JetPay Merchant Services, LLC v. Chartis Specialty Insurance Company* (the "JetPay Coverage Action"), which was an insurance coverage dispute based on a different merchant's bankruptcy, and the JetPay Action, which involved claims by JetPay against Merrick, RGS and Richmond due to their alleged failure to obtain insurance coverage for JetPay that would have provided coverage for losses JetPay sustained

from the Direct Air bankruptcy. *See* Dkt. No. 24. The Settlement Agreement also resolved disputes regarding JetPay's Claim for coverage under the JetPay Policy for chargeback losses due to the PHSM bankruptcy and the JetPay Policy. By its express terms, the Indemnity Provision applies only to the four listed matters, not to all claims arising from the Direct Air Loss. *See id*. at 9 ¶ 4(B).

In the Settlement Agreement, JetPay released RGS and Richmond from all claims regarding JetPay's claims for coverage under the JetPay Policy for losses incurred as a result of the Direct Air and PSHM bankruptcies, Richmond's representation of JetPay in procuring the JetPay Policy, and/or Richmond's handling of JetPay's Claim regarding the PSHM bankruptcy. See Dkt. No. 24 at 4-5 ¶2(B). Reading the Release Provision and the Indemnity Provision together, JetPay agreed to indemnify RGS and Richmond for the claims that JetPay had released – namely, that RGS and Richmond failed to obtain uncollectible chargeback insurance coverage for JetPay. *See Italian Cowboy Ptrs., Ltd v. Prudential Ins. Co. of Am.,* 341 S.W.3d 323, 333 (Tex. 2011) (to "ascertain the true intentions of the parties as expressed in the writing itself," the Court "must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless"). The claims raised in the Merrick Action concerning RGS's and Richmond's alleged failure to procure uncollectible chargeback insurance for Merrick Bank are not claims released in the Settlement Agreement.

And Merrick Bank was a defendant in JetPay Action, *see* Dkt. No. 81 at App. 5 -18, but not a party to the Settlement Agreement, *see* Dkt. No. 24. And Merrick Bank

was the only party in the JetPay Action that did not participate in the Settlement Agreement. There is no express language from which it can be reasonably inferred that the parties intended the Indemnity Provision would apply to Merrick Bank. To the contrary, the Settlement Agreement provided that it did not affect any of JetPay's claims against Merrick Bank. *See id.* at 7 ¶ 3(B)(ii)

Not only did the Settlement Agreement exclude JetPay's claims against Merrick Bank in the JetPay Action, but the parties also expressly stated throughout the Settlement Agreement that it did not settle, release, or provide indemnification for any claims asserted in and "shall not apply" to the pending *Merrick Bank Corporation v. Chartis Specialty Insurance Company* case, which was a coverage case concerning the alleged failure to procure insurance for Merrick Bank. *See id.* at 3-4 ¶ 2(A), 5-6 at ¶ 2(C), 6-7 at ¶ 2(D), 9 at ¶ 3(A).

To construe the Indemnity Provision as broadly as Plaintiffs suggest would enlarge JetPay's alleged indemnity obligations and produce a result that is unreasonable, oppressive, and "untethered from the contract containing the provision and bring activities independent of the contract within the scope of the indemnity provision simply because they relate to the general subject of the contract." *RKI*, 2022 WL 2252895, at *17. It would, in effect, give RTG-MI and Richmond the "keys to the indemnity kingdom" by freeing them from liability for any act they have taken or will take regarding the Direct Air bankruptcy even if those actions bear no relationship to JetPay or the JetPay Action. *Id.* at *18.

If that were the parties' intent, the Indemnity Provision would have stated that

JetPay agreed to indemnify RGS and Richmond for claims "arising from or out of, or relating in any way, in whole or in part, to (5) the Direct Air bankruptcy." But they did not include the Direct Air bankruptcy as one of the specifically enumerated categories covered by the Indemnity Provision.

Even construing the Indemnity Provision broadly, and giving the words of the Settlement Agreement and Indemnity Provision their plain meaning, the Court determines that the parties to the Settlement Agreement did not intend the Indemnity Provision to cover any claims made by Merrick Bank.

The Court concludes the Merrick Action is outside the scope of the Indemnity Provision and that JetPay did not breach a contract when it denied RTG-MI's and Richmond's claims for indemnity for attorneys' fees and expenses that they incurred in the Merrick Action.

## Conclusion

The Court grants Defendant's Motion for Summary Judgment [Dkt. No. 79] and denies Plaintiffs' Motion for Partial Summary Judgment [Dkt. No. 76].

The Court will separately enter a judgment in favor of Defendants JetPay Payment Services, TX, LLC, f/k/a JetPay Merchant Services, LLC and WLES, LP.

SO ORDERED.

DATED: March 8, 2023

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE